Slip Op. 13-126

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DEACERO S.A. DE C.V. and DEACERO USA, INC., <br><br>                              Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>                              Defendant,<br><br> and<br><br>ARCELORMITTAL USA LLC, GERDAU AMERISTEEL U.S. INC., EVRAZ ROCKY MOUNTAIN STEEL, and NUCOR CORPORATION,<br><br>                              Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 12-00345<br><br>**PUBLIC VERSION** |

**OPINION AND ORDER**

[The court remands the Department of Commerce's final affirmative determination of circumvention of the antidumping duty order on certain wire rod from Mexico.]

Dated: September 30, 2013

*David E. Bond* and *Jay C. Campbell*, White & Case LLP, of Washington, DC, for plaintiffs.

*Jane C. Dempsey*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were *Stuart F. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the brief was *Mykhaylo Grylov*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Paul C. Rosenthal* and *David C. Smith*, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenors ArcelorMittal USA LLC, Gerdau Ameristeel U.S. Inc., and Evraz Rocky Mountain Steel.

*Daniel B. Pickard*, *Maureen E. Thorson*, and *Derick G. Holt*, Wiley Rein LLP, of Washington, DC, for defendant-intervenor Nucor Corporation.

Goldberg, Senior Judge: Plaintiffs Deacero S.A. de C.V. and Deacero USA, Inc. (collectively, "Deacero") contest the Department of Commerce's ("Commerce" or the "Department") affirmative final determination of circumvention of the antidumping duty order on certain wire rod from Mexico. *See Carbon and Certain Alloy Steel Wire Rod from Mexico*, 77 Fed. Reg. 59,892 (Dep't Commerce Oct. 1, 2012) (affirmative final determination of circumvention) ("*Final Determination*"). In that determination, Commerce found that wire rod with an actual diameter of 4.75 millimeter ("mm") to 5.00 mm constituted a minor alteration of subject merchandise under 19 U.S.C. § 1677j(c) (2006), and that it was, accordingly, subject to the antidumping duty order. 77 Fed. Reg. at 59,893.

In the instant action, Deacero contends, *inter alia*, that 4.75 mm steel wire rod was not a circumventing minor alteration of subject merchandise because it was both in existence during the original investigation and specifically excluded from the scope of the subject merchandise as defined during the investigation. For the following reasons, the court agrees and remands to Commerce for reconsideration of its affirmative circumvention finding.

## FACTUAL BACKGROUND

On August 31, 2001, U.S. wire rod producers petitioned for the imposition of antidumping duties on carbon and certain steel wire rod from Brazil, Indonesia, Mexico, Moldova, Trinidad and Tobago, and Ukraine at less than fair value. Admin. R. Pub. ("P.R.") Pt. 1, Doc. 10, Ex. 2; Admin. R. Conf. ("C.R.") Pt. 3, Doc. 4, Ex. 2. Following the International Trade Commission's ("ITC") and Commerce's investigations, Commerce published notice of an antidumping duty order on October 29, 2002 (the "Order"). *Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico, Moldova, Trinidad and Tobago, and Ukraine*, 67 Fed.

Reg. 65,945 (Dep't Commerce Oct. 29, 2002) (notice of antidumping duty orders). Adopting petitioners' scope recommendation, Commerce defined the Order's scope as follows:

> The merchandise subject to these orders is certain hot-rolled products of carbon steel and alloy steel, in coils, of approximately round cross section, 5.00 mm or more, but less than 19.00 mm, in solid cross-sectional diameter.
>
> Specifically excluded are steel products possessing the above-noted physical characteristics and meeting the Harmonized Tariff Schedule of the United States (HTSUS) definitions for (a) stainless steel; (b) tool steel; (c) high nickel steel; (d) ball bearing steel; and (e) concrete reinforcing bars and rods. Also excluded are (f) free machining steel products (*i.e.*, products that contain by weight one or more of the following elements: 0.03 percent or more of lead, 0.05 percent or more of bismuth, 0.08 percent or more of sulfur, more than 0.04 percent of phosphorus, more than 0.05 percent of selenium, or more than 0.01 percent of tellurium).
>
> Also excluded from the scope are 1080 grade tire cord quality wire rod and 1080 grade tire bead quality wire rod. . . . All products meeting the physical description of subject merchandise that are not specifically excluded are included in this scope.

*Id.* at 65,946. The ITC found a single like product "consisting of all carbon and certain alloy steel wire rod included within Commerce's scope, and including the grade 1080 tire bead and tire cord quality wire rod that has been excluded from Commerce's scope." P.R. Pt. 2, Doc. 14, Attach. at 7; C.R. Pt. 4, Doc. 15, Attach. at 7.

Several years later, Deacero—a Mexican steel wire rod manufacturer—began producing and selling 4.75 mm wire rod. On February 11, 2011, U.S. wire rod producers requested that the Department initiate either a scope inquiry or an anti-circumvention inquiry[1] to determine whether imports of Deacero's 4.75 mm wire rod should be subject to antidumping duties. P.R. Pt. 1, Docs. 1–2; C.R. Pt. 3, Docs. 1–2.

Commerce declined to initiate a scope inquiry, finding that the Order referred to actual diameter and that wire rod with an actual diameter of less than 5.00 mm was outside the scope of

---

[1] The court uses the phrases "anti-circumvention inquiry" and "circumvention inquiry" interchangeably throughout this opinion.

the Order.  P.R. Pt. 1, Doc. 24 at 13; C.R. Pt. 3, Doc. 7 at 13.  Moreover, as Commerce found that wire rod less than 5.00 mm in diameter was commercially available prior to issuance of the Order, Commerce did not initiate a later-developed product inquiry.  *Id.* at 14.  Commerce did, however, initiate a minor alteration inquiry to determine whether wire rod between 4.75 mm and 5.00 mm was "altered in form or appearance in minor respects," and includable within the scope of the Order.  *See Carbon and Certain Alloy Steel Wire Rod from Mexico*, 76 Fed. Reg. 33,218, 33,219 (Dep't Commerce June 8, 2011) (initiation of anti-circumvention inquiry).

Throughout the proceeding, Deacero argued that 4.75 mm wire rod was not a minor alteration of subject merchandise.  In support, Deacero noted that 4.75 mm wire rod existed before the wire rod investigation, and petitioners chose to exclude it from the Order's scope.  *See, e.g.*, P.R. Pt. 2, Doc. 27 at 7–8; C.R. Pt. 4, Doc. 22 at 7–8.  Commerce rejected Deacero's argument, finding that a product's existence before the investigation does not "preclude[] the Department from conducting a minor alterations analysis."  P.R. Pt. 2, Doc. 47 at 4; C.R. Pt. 4, Doc. 26 at 4.  As a result, Commerce proceeded with an analysis of the five analytical factors found in the legislative history accompanying the circumvention statute.  *Id.* (citing S. Rep. No. 100-71, at 100 (1987)).  The Department issued its final affirmative determination of circumvention on October 1, 2012.  *Final Determination*, 77 Fed. Reg. at 59,893.

## SUBJECT MATTER JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and must sustain Commerce's final affirmative circumvention determination unless it is unsupported by substantial record evidence or otherwise not in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  The Court

reviews the substantiality of the evidence "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)).

The Court undertakes a two-part inquiry to assess whether Commerce's statutory interpretation is in accordance with law. *See Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). First, the Court asks whether Congress has directly spoken to the question at issue. *Id.* at 842. If it has, this Court must defer to Congress's unambiguously expressed intent. *Id.* at 843. To ascertain congressional intent, the Court "employ[s] the traditional tools of statutory construction." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 882 (Fed. Cir. 1998) (internal quotation marks omitted). Although the authoritative statement is the statute's text, resort to "the statute's structure, canons of statutory construction, and legislative history" is appropriate if necessary. *Id.*

If, after consideration of the traditional tools of statutory interpretation, a statute remains "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. In deciding whether to defer to Commerce's statutory interpretation, this Court will not "substitut[e] its own construction of a statutory provision for" Commerce's own reasonable interpretation. *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992) (internal quotation marks omitted); *see also Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (providing that the agency's "view governs if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts").

# DISCUSSION

## I.   Legal framework for anti-circumvention inquiries

The language of an antidumping duty order conclusively determines its scope. *Polites v. United States*, 465 F. App'x 962, 965 (Fed. Cir. 2012). Accordingly, Commerce may not "impermissibly expand[]" an order by "chang[ing] the scope of that order" or by "interpret[ing] an order in a manner contrary to its terms." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1072 (Fed. Cir. 2001). Nonetheless, when questions arise regarding an order's scope, Commerce may conduct a scope determination that clarifies or reasonably interprets an order. *See Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995).

A scope determination can take two forms. When Commerce initiates a scope inquiry under 19 C.F.R. § 351.225(k) (2012), it assesses "whether a particular product is included within the scope of an order." When Commerce initiates a circumvention inquiry pursuant to 19 C.F.R. § 351.225(g)–(j), however, it asks whether a product outside an order's literal scope should nonetheless be included within the scope as part of the class or kind of merchandise subject to the antidumping duty order. Circumvention inquiries cover four types of products, including products "altered in form or appearance in minor respects . . . whether or not included in the same tariff classification."  19 U.S.C. § 1677j(c).

Section 1677j(c) is silent regarding procedure for minor alteration inquiries, but legislative history offers general insight into what factors Congress expected Commerce to consider. Specifically, Commerce examines "such criteria as the overall characteristics of the merchandise, the expectations of ultimate users, the use of the merchandise, the channels of marketing[,] and the cost of any modification relative to the total value of the imported product." S. Rep. No. 100-71, at 100. Commerce has also previously considered other factors like the

"commercial availability of the product at issue prior to the issuance of the order as well as the circumstances under which the products at issue entered the United States, the timing and quantity of said entries during the circumvention review period, and the input of consumers in the design phase of the product at issue." P.R. Pt. 1, Doc. 24 at 14; C.R. Pt. 3, Doc. 7 at 14.

Unless Commerce determines that it would be "unnecessary," Commerce will include within an order's scope circumventing merchandise that is "so insignificantly" changed from covered merchandise that it should be included in the order. *See* 19 U.S.C. § 1677j(c); *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998). Unlike other circumvention proceedings, Commerce need not consult with the ITC regarding injury prior to reaching an affirmative minor alteration circumvention determination.[2]

## II. U.S. law does not preclude conducting a minor alteration inquiry when the allegedly circumventing merchandise existed during the investigation

Deacero avers as a threshold legal matter that § 1677j(c) cannot reach 4.75 mm wire rod based on the unambiguous meaning of that statutory provision. Pl.'s Mot. for J. on Agency R. ("Deacero Br."), ECF No. 50, at 12. Specifically, Deacero maintains that because § 1677j(c) applies on its face to subject merchandise "altered" in minor respects to make it non-subject, it "cannot apply to pre-existing products that were excluded by [Commerce] and the petitioners from the scope of the original investigation and resulting order." *Id.* at 14. To assess Deacero's argument, the court applies the *Chevron* framework outlined above.

---

[2] In the other circumvention proceedings, Commerce must notify the ITC of its intention to include circumventing merchandise within the scope of an order. *See* 19 U.S.C. § 1677j(e). This requirement permits the ITC to evaluate whether inclusion of the circumventing merchandise would conflict with the ITC's affirmative injury determination. *See id.* Because the minor alteration provision only covers insignificant changes to subject merchandise, Congress apparently did not anticipate a conflict with an ITC injury determination in that limited scenario. *Wheatland Tube Co. v. United States*, 21 CIT 808, 826, 973 F. Supp. 149, 163 (1997). Nonetheless, "Congress did not approve, through the minor alterations provision, wholesale changes to the scope of orders." *Id.*

### A. Application of traditional tools of statutory interpretation does not unambiguously reveal Congress's intent

The circumvention statute does not define the word "alter"; consequently, the court assumes that Congress intended to "incorporate the established meaning of the[] term[]." *NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed. Cir. 1997). The court may consult dictionaries to ascertain established meaning. *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001). Dictionaries define the verb "alter" in the following ways: (1) "[t]o make (a thing) otherwise or different in some respect," Oxford English Dictionary 365 (2d ed. 1989); (2) "to make some change in character, shape, condition, position, quantity, value, etc. without changing the thing itself for another," *id.*; (3) "[t]o change or make different; modify," Am. Heritage Dictionary of the English Language 53 (4th ed. 2000). Although Deacero argues otherwise, these definitions focus on the modification of an existing item and do not clearly require that the modification result in something entirely novel.

The structure of 19 U.S.C. § 1677j further undermines Deacero's position. The subsection pertaining to later-developed products, § 1677j(d), immediately follows the subsection governing minor alterations. In referring to "later-developed" products, § 1677j(d) expressly requires that Commerce determine when an allegedly circumventing product was developed. By comparison, the neighboring § 1677j(c) imposes no such temporal requirement.

It is a canon of statutory interpretation that the court generally cannot read restrictions into a statute that the legislature has not clearly expressed. *See Bilski v. Kappos*, 130 S. Ct. 3218, 3221 (2010) (articulating this principle in the context of patent law). That principle is particularly relevant in this case, where Congress imposed a time-based limitation in one subsection of the circumvention statute (§ 1677j(d)) and not in another (§ 1677j(c)).

Accordingly, the court declines to accept Deacero's proposed interpretation as the unambiguous will of Congress when it enacted the circumvention statute.

This finding is consistent with the sparse legislative history of the minor alteration provision, which fails to confirm Deacero's proffered interpretation. *See* Deacero Br. at 14 (citing S. Rep. No. 100-71, at 100; H.R. Rep. No. 100-40, at 135 (1987); H.R. Rep. No. 100-576 (1988) (Conf. Rep.), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1633).

For example, Senate Report Number 100-71, at 101, reads in pertinent part:

> An important purpose of this provision is to avoid results such as the one reached by the Commerce Department in a case involving portable electric typewriters from Japan, where a minor alteration resulted in portable typewriters with calculator or memory features being excluded from the scope of an existing antidumping order on portable typewriters. The Committee intends this provision to prevent foreign products from circumventing existing findings or orders through the sale of later developed products or of products with minor alterations that contain features or technologies not in use in the class or kind of merchandise imported into the United States at the time of the original investigation. . . .

Initially, that language describes a previous version of the anti-circumvention provision that collapsed later-developed and minor alteration inquiries into a single provision; it does not directly address the version of the statute presently before the court. Moreover, the report does not unambiguously preclude application of the minor alteration provision to pre-existing merchandise. Instead, by using the phrase "such as" with respect to Japanese typewriters, the report provides but one example of the type of behavior Congress intended the anti-circumvention statute to reach (while not necessarily foreclosing a different type of application).

The language of House Report Number 100-40 is similarly open-ended. That report reiterates that the purpose of a minor alteration inquiry is to "prevent the practice whereby a foreign producer alters the merchandise in minor respects in form or appearance to circumvent an outstanding order." *Id.* at 135. The report then offers examples of when a minor alteration

inquiry "might apply," like "when steel sheet is temper rolled prior to importation into the United States or when a fire resistance coating is applied to cookware prior to importation." *Id.* The court reads that language as merely exemplary of the statute's possible applicability and, in any event, the examples do not clearly impose a temporal limitation.

### B. Commerce's interpretation was based on a permissible construction of § 1677j(c)

In sum, the minor alteration statute does not unambiguously impose an implicit temporal limitation on Commerce when conducting a minor alteration inquiry. Because § 1677j(c) neither mandates nor forbids a temporal inquiry, the court next asks whether Commerce's interpretation was reasonable. The court "may look to 'the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole'" to make this determination. *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007) (quoting *NSK Ltd. v. United States*, 26 CIT 650, 654, 217 F. Supp. 2d 1291, 1297 (2002)).

Commerce's refusal to read an implicit limitation into the statute was reasonable when viewed in light of the structure of the circumvention statute detailed above. Commerce's interpretation is also consistent with the overall objective behind circumvention inquiries. Congress enacted the anti-circumvention statute because the existence of various legal "loopholes" was "seriously undermin[ing] the effectiveness of the remedies provided by the antidumping and countervailing duty proceedings, and frustrat[ing] the purposes for which these laws were enacted." S. Rep. No. 100-71, at 101. To thwart increasing circumvention, Congress sought Commerce's "aggressive implementation" of the statute. *Id.*

Congress obviously intended for Commerce to have wide latitude to aggressively apply the circumvention statute. But under Deacero's logic, a product's mere existence during the investigation—regardless of when or where it existed, and even if no one actually knew it

existed—would foreclose a minor alteration circumvention inquiry if the pre-existing product were outside the literal scope of the resulting order. Imposing this rigid requirement would weaken the wide discretionary authority that Congress granted Commerce under the circumvention statute.

Commerce's interpretation likewise comports with case law interpreting the minor alteration provision. In *Wheatland*, 161 F.3d at 1366, a domestic pipe producer appealed from Commerce's final negative scope determination. The scope of the order in *Wheatland* expressly excluded "[s]tandard pipe . . . that enters the U.S. as line pipe of a kind used for oil or gas pipelines." *Id.* at 1367. When exporters began selling expressly excluded non-subject line pipe and using it in standard pipe applications, Commerce initiated a scope determination and ultimately found that the merchandise in question was outside the order's scope. *Id.* at 1368. The domestic pipe producers argued on appeal that Commerce erred in conducting a scope determination instead of a minor alteration inquiry. *Id.* at 1369.

The court upheld Commerce's decision *not* to conduct a minor alteration inquiry because it would have forced Commerce to interpret the order to both include and exclude the same merchandise. *Id.* at 1370. The inquiry was, "therefore, unnecessary because it [could] lead only to an absurd result" and would frustrate the purpose of antidumping laws by allowing the assessment of duties "on products intentionally omitted from the ITC's injury investigation." *Id.* at 1371. In reaching this determination, the Federal Circuit noted that "[s]ection 1677j(c) does not apply to products unequivocally excluded from the order in the first place." *Id.*

The Federal Circuit later clarified its *Wheatland* ruling in *Nippon Steel Corp. v. United States*, 219 F.3d 1348 (Fed. Cir. 2000). The scope of the carbon steel order in *Nippon* excluded "other alloy steel," and "other alloy steel" in turn included steel with 0.0008 percent or more of

boron. *Id.* at 1350. After the order went into effect, exporters began adding boron in amounts exceeding 0.0008 to take their product outside the order's scope. *Id.* Commerce initiated a minor alteration inquiry, but this court enjoined the inquiry on the basis of the holding in *Wheatland*. *Id.* at 1356. In reversing, the Federal Circuit distinguished the broad language from *Wheatland*. First, *Wheatland* only found that Commerce's decision not to conduct a minor alteration inquiry was reasonable, but it "did not hold that Commerce had *no authority* to conduct a minor alterations inquiry." *Id.* (emphasis added). Furthermore, *Wheatland* involved "two different products, both of which were well known when the order was issued," in contrast to the steel product in *Nippon*. *Id.*

### III. Nonetheless, based on the facts of this case, an affirmative circumvention determination was an unreasonable expansion of the Order's scope

Concluding that the minor alteration provision could plausibly reach pre-existing merchandise does not end the court's inquiry. Congress intended § 1677j(c) to apply to products "so insignificantly changed from a covered product that they should be considered within the scope of the order even though the alterations remove them from the order's literal scope." *Wheatland*, 161 F.3d at 1371. Section 1677j(c) "does not, however, abrogate the cases prohibiting changing or interpreting orders contrary to their terms" or to the domestic like product definition. *Id.* Thus, Commerce errs when it changes an order to cover more than "insignificantly changed" merchandise. Commerce appears to have done just that in this case.

Commerce found on the record that small diameter wire rod "was commercially available prior to the issuance of the *Wire Rod Order*." P.R. Pt. 1, Doc. 24 at 14; C.R. Pt. 3, Doc. 7 at 14.[3]

---

[3] Specifically, Commerce based its determination on a technical report from Kawasaki Steel "indicat[ing] that the firm developed a four-roll mill capable of producing wire rod with . . . diameters as narrow as 4.2 mm in the 1990s and that such small diameter wire rod was put into commercial operation in 1998." P.R. Pt. 1, Doc. 24 at 14; C.R. Pt. 3, Doc. 7 at 14. Although Commerce reached its commercial availability conclusion in deciding not to initiate a later-developed product inquiry, that factual finding is on the record in this action. Petitioners have not

Commercial availability means that a product is "present in the commercial market or fully developed, i.e., tested and ready for commercial production, but not yet in the commercial market." *Target Corp. v. United States*, 609 F.3d 1352, 1358 (Fed. Cir. 2010). Because small diameter wire rod was commercially available prior to the Order's issuance, petitioners could have included it in the Order's scope. Instead, using diameter as the defining characteristic, petitioners settled on a range between 5.00 mm and less than 19.00 mm. 4.75 mm wire rod is unequivocally outside of this carefully pre-determined range.

Essentially, then, Commerce determined that 4.75 mm wire rod was a circumventing "minor alteration" of subject merchandise even though (1) it was commercially available before the Order was issued, (2) diameter was the essential characteristic defining the Order's scope,[4] and (3) wire rod with an actual diameter of 4.75 mm unambiguously fell outside the Order. Commerce's determination was not supported by substantial record evidence. There is nothing minor or insignificant about producing 4.75 mm wire rod when diameter is the fundamental focus of the Order and the Order intentionally excludes wire rod less than 5.00 mm in diameter.

Commerce's justification of this illogical conclusion is unpersuasive. Specifically, Commerce rationalized in its initiation memorandum:

> In *Nippon Steel* the CAFC found that the Department may be precluded from conducting a minor alteration inquiry in instances in which the product is well-known prior to the order and was specifically excluded from the investigation. The *Wire Rod O[r]der* does not specifically exclude wire rod with an actual

---

instituted litigation to challenge that finding, so it is now "final and conclusive." *See Target Corp. v. United States*, 609 F.3d 1352, 1363 (Fed. Cir. 2010). Defendant-Intervenors aver in briefing in this action that 4.75 mm wire rod was not commercially available, but the court "may not entertain a collateral attack" at this juncture. *See id.*

[4] Commerce concluded below that 4.75 mm wire rod differed from subject wire rod only in diameter, and that 4.75 mm wire rod was otherwise "indistinguishable in any meaningful sense." Carbon and Certain Alloy Steel Wire Rod from Mexico, 76 Fed. Reg. 78,882, 78,884 (Dep't Commerce Dec. 20, 2011) (affirmative prelim. determination); P.R. Pt. 2, Doc. 47 at 10; C.R. Pt. 4, Doc. 26 at 10. But this analysis ignores that diameter is the most fundamental physical characteristic under the Order. Section 1677j(c) is intended to reach products that are changed in insignificant ways to remove them from an order's literal scope. *See Wheatland*, 161 F.3d at 1371. There is nothing "insignificant" about diameter here as it is the central focus of the Order.

diameter between 4.75 mm and 5.00 mm and, thus, the conditions necessary for the Department to be precluded from conducting a minor alteration inquiry are not present.

See P.R. Pt. 1, Doc. 24 at 15; C.R. Pt. 3, Doc. 7 at 15 (internal citation omitted).

Commerce's summary analysis is flawed. While there may be *some* circumstances where it would be appropriate to apply the minor alteration provision to pre-existing merchandise, Commerce incorrectly assumed that it is *always* appropriate unless the product was well-known prior to the order and was specifically excluded from the investigation. This interpretation conflicts with Commerce's own admission that circumvention inquiries are inherently fact-specific. *See id.* at 14 ("Each case is highly dependent on the facts on the record, and must be analyzed in light of those specific facts.").

Moreover, Commerce's analysis of whether the Order specifically excludes 4.75 mm wire rod is conclusory and unsupported. Commerce apparently believes that 4.75 mm wire rod is not specifically excluded from the Order because there is no clause expressly excluding wire rod with diameters between 4.75 mm and 5.00 mm. However, 4.75 mm wire rod is unlike the other "specific exclusions" in the Order, which refer to articles otherwise falling within the specified diameter range. If 4.75 mm wire rod was a commercially available product before the investigation, setting the diameter range of subject merchandise from 5.00 mm to less than 19.00 mm could not be anything less than the specific exclusion of 4.75 mm wire rod. Commerce's contrary conclusion relies too heavily on whether Commerce actually used the phrase "specifically excluded" to refer to 4.75 mm wire rod.[5]

---

[5] Citing Federal Circuit case law, three Defendant-Intervenors argue that 4.75 mm is only impliedly excluded, and that implied exclusions are not specific exclusions. *See* Arcelormittal USA LLC, Gerdau Ameristeel U.S. Inc., and Evraz Rocky Mountain Steel Resp. to Deacero's Rule 56.2 Mem. of Points & Authorities, ECF No. 61, at 7. However, the cases Defendant-Intervenors cite are readily distinguishable. In *Target Corp.*, 609 F.3d at 1363, the disputed scope language referred to certain "petroleum wax candles from petroleum wax and having fiber or paper-color wicks." The Federal Circuit found that the language did not clearly and unambiguously exclude mixed-wax candles containing only *some* petroleum wax. *Id.* Here, a range from 5.00 to less than 19.00 mm

In sum, it seems that Commerce has impermissibly interpreted the Order contrary to its carefully crafted terms. Commerce included 4.75 mm wire rod within the Order's scope even though it was commercially available before the investigation and petitioners consciously chose to limit the Order's reach to certain steel products "5.00 mm or more, but less than 19.00 mm, in solid cross-sectional diameter." *See* 67 Fed. Reg. at 65,946. Rather than address these important facts, Commerce simply asserted that its determination was reasonable because 4.75 mm wire rod was not specifically excluded from the Order and application of the five factors from the legislative history signaled that the two products were similar. By taking this rigid, and ultimately flawed, approach, Commerce issued a determination that was unsupported by substantial evidence and not in accordance with law.

In reality, petitioners want to rewrite the Order so it says what they wish it had said at its inception. This belated attempt (that Commerce sanctioned) was unfair to Deacero, which invested substantial amounts of money in manufacturing what it reasonably considered non-subject merchandise. If petitioners believe they are being injured by imports of 4.75 mm wire rod at less than fair value, they should petition for the imposition of antidumping duties on small diameter wire rod. Based on the court's present understanding, a circumvention inquiry was not the proper avenue for petitioners in this case.[6]

---

"clearly and unambiguously" excludes diameters outside that range. Similarly, in *King Supply Co. v. United States*, 674 F.3d 1343, 1346–47 (Fed. Cir. 2012), the scope language referred to certain pipe fittings and explained that such fittings "are used to join sections in piping systems." The Federal Circuit agreed with Commerce that the "are used" language was exemplary and was not an end-use exclusion absent "clear exclusionary language." *Id.* at 1349. This case does not involve an end-use provision, and the diameter range here cannot reasonably be considered exemplary.

[6] Were the court to conclude otherwise, it might "frustrate the purpose of the antidumping laws" by "allow[ing] Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation." *Wheatland*, 161 F.3d at 1371. This court would also indirectly encourage manipulation of the antidumping duty process. When defining the class of merchandise subject to an investigation, petitioners normally avoid over-broad product descriptions lest they risk a negative ITC injury determination. If the court extended the minor alteration provision beyond truly insignificant changes to subject merchandise, petitioners would have an incentive to narrowly define subject merchandise and later broaden an order's reach through use of a minor alteration inquiry. Congress could not have intended this result.

**CONCLUSION AND ORDER**

For the foregoing reasons, Commerce is instructed to reconsider its finding that 4.75 mm wire rod is circumventing the Order. If Commerce continues to conclude on remand that 4.75 mm wire rod is a circumventing minor alteration of subject merchandise, Commerce must thoroughly explain how the record and relevant law supports that determination in light of the preceding discussion.[7]

Accordingly, upon consideration of all papers and proceedings in this case and upon due deliberation, it is hereby

**ORDERED** that the *Final Determination* is remanded to Commerce for reconsideration and redetermination in accordance with this Opinion and Order;

**ORDERED** that Commerce shall file its remand redetermination within ninety (90) days of the date of this Opinion and Order, that Deacero and Defendant-Intervenors shall have thirty (30) days from the filing of the remand redetermination in which to file with the court comments on the remand redetermination, and that the Government shall have fifteen (15) days from the date of the last filing of such comments in which to file with the court any responses to other parties' comments.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated: September 30, 2013
New York, New York

---

[7] Deacero also argues that Commerce's affirmative finding of circumvention was unsupported by substantial evidence given Deacero's legitimate commercial reasons for offering wire rod of that size. The court has not addressed that secondary argument in this opinion, but will consider it after remand if appropriate.