Slip Op. 14-99

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| DEACERO S.A.P.I. DE C.V. and DEACERO USA, INC.,<br><br>                                   Plaintiffs,<br><br>v.<br><br>UNITED STATES,<br><br>                                   Defendant,<br><br> and<br><br>ARCELORMITTAL USA LLC, GERDAU AMERISTEEL U.S. INC., EVRAZ ROCKY MOUNTAIN STEEL, and NUCOR CORPORATION,<br><br>                                   Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge<br>Court No. 12-00345 |

**OPINION AND ORDER**

[Remanding the Department of Commerce's remand redetermination.]

Dated: August 28, 2014

*David E. Bond* and *Jay C. Campbell*, White & Case LLP, of Washington, DC, for plaintiffs.

*Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant.  With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director.  Of counsel on the brief was *David Richardson*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Paul C. Rosenthal*, *Kathleen W. Cannon*, *R. Alan Luberda*, and *David C. Smith*, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenors ArcelorMittal USA LLC, Gerdau Ameristeel U.S. Inc., and Evraz Rocky Mountain Steel.

*Alan H. Price*, *Daniel B. Pickard*, and *Maureen E. Thorson*, Wiley Rein LLP, of Washington, DC, for defendant-intervenor Nucor Corporation.

Goldberg, Senior Judge: This matter returns to the court following a remand of the U.S.

Department of Commerce's ("Commerce") final affirmative determination of circumvention of

the antidumping duty order on certain wire rod from Mexico ("Wire Rod Order").  *See Carbon*

*and Certain Alloy Steel Wire Rod from Mexico*, 77 Fed. Reg. 59,892 (Dep't Commerce Oct. 1,

2012) (final affirm. circumvention) ("*Final Determination*").  In its remand order, the court

instructed Commerce to reconsider its conclusion that Deacero S.A.P.I. de C.V.[1] and Deacero

USA, Inc.'s (collectively, "Deacero") wire rod with an actual diameter of 4.75 millimeters

("mm") was a circumventing minor alteration of subject wire rod under 19 U.S.C. § 1677j(c)

(2006).  *See Deacero S.A. de C.V. v. United States*, 37 CIT __, __, 942 F. Supp. 2d 1321, 1332

(2013) ("*Deacero I*").  On remand, Commerce concluded under protest that Deacero's wire rod

was not circumventing the Wire Rod Order.  Final Results of Redetermination Pursuant to Ct.

Remand 6, ECF No. 87 ("*Remand Results*").

Defendant-Intervenors ArcelorMittal USA LLC, Gerdau Ameristeel U.S. Inc., Evraz

Rocky Mountain Steel (collectively, "the Domestic Industry"), and Nucor Corporation ("Nucor")

filed comments challenging Commerce's *Remand Results*.  ArcelorMittal, Gerdau, and Evraz

Cmts. on Remand Redetermination, ECF No. 94 ("Domestic Indus. Cmts."); Nucor Cmts. on

Remand Redetermination, ECF No. 95 ("Nucor Cmts.").  Both Deacero and the United States

("the Government") request that the court sustain the *Remand Results*.  Deacero Cmts. on

Remand Redetermination, ECF No. 93; Gov't Cmts. on Remand Redetermination, ECF No. 105

("Gov't Cmts.").  For reasons set forth below, this matter is again remanded so Commerce has an

opportunity to explain whether it wishes to revisit its commercial availability finding.

---

[1] On December 16, 2013, Deacero S.A. de C.V.'s legal name changed to Deacero S.A.P.I. de C.V.  Mot. to
Amend Case Caption, ECF No. 84.  The court has amended the case caption accordingly.  *See* Order, ECF No. 86.

## BACKGROUND

Many of the facts relevant to this case were identified in the court's opinion in *Deacero I*.

*See* 37 CIT at __, 942 F. Supp. 2d at 1324–25.  To briefly summarize, this case concerns a minor

alteration inquiry initiated pursuant to 19 U.S.C. § 1677j(c).  *See Carbon and Certain Alloy Steel*

*Wire Rod from Mexico*, 76 Fed. Reg. 33,218, 33,219 (Dep't Commerce June 8, 2011) (initiation

of circumvention inquiry).  The purpose of Commerce's inquiry was to determine whether

Deacero's imports of 4.75 mm wire rod were circumventing the Wire Rod Order, which defines

subject merchandise as "certain hot-rolled products of carbon steel and alloy steel, in coils, of

approximately round cross section, 5.00 mm or more, but less than 19.00 mm, in solid cross-

sectional diameter" along with several specific exclusions.  *See Carbon and Certain Alloy Steel*

*Wire Rod from Brazil, Indonesia, Mexico, Moldova, Trinidad and Tobago, and Ukraine*, 67 Fed.

Reg. 65,945, 65,946 (Dep't Commerce Oct. 29, 2002) (notice of antidumping duty orders)

("*Order*").  After analyzing five factors set forth in relevant legislative history,[2] Commerce

answered that question affirmatively.  *See Final Determination*, 77 Fed. Reg. at 59,893.

In deciding to conduct a minor alteration inquiry, Commerce declined to initiate a later-

developed product circumvention inquiry under § 1677j(d).  *See* Initiation Memorandum 14, PD

I 24 (May 31, 2011), ECF No. 43 (Dec. 19, 2012) ("*Initiation Mem.*").  Commerce reached that

determination upon concluding that small diameter wire rod "was commercially available prior

to the issuance of the *Wire Rod Order*."  *See id.*  Commerce's finding regarding commercial

availability was on the record in this case and was not challenged by Deacero.  Defendant-

---

[2] 19 U.S.C. § 1677j(c) does not identify a particular analytical framework that Commerce must follow when conducting a minor alterations inquiry.  But legislative history pertaining to a time when the minor alteration and later-developed product inquiries were collapsed into a single inquiry counsels that Commerce "should consider such criteria as the overall characteristics of the merchandise, the expectations of ultimate users, the use of the merchandise, the channels of marketing and the cost of any modification relative to the total value of the imported product."  S. Rep. No. 100-71, at 100 (1987).  This list does not appear to be exhaustive, and Commerce has considered additional factors in practice.  *See Deacero I*, 37 CIT at __, 942 F. Supp. 2d at 1326.

Intervenors, the only parties challenging that finding, did not meet the jurisdictional prerequisites

for judicial review. *See Target Corp. v. United States*, 609 F.3d 1352, 1363 (Fed. Cir. 2010)

(citing 19 U.S.C. § 1516a(a)(2)(A), requiring filing of summons and complaint to gain standing).

The court determined that Commerce's affirmative circumvention determination was not

supported by substantial record evidence and did not accord with law. *Deacero I*, 37 CIT at __,

942 F. Supp. 2d at 1332. The court focused on several factors to arrive at this conclusion.

Initially, the court deferred to Commerce's finding that 4.75 mm wire rod was commercially

available at the Wire Rod Order's inception. *Id.* at 1330 & n.3. Because 4.75 mm wire rod was

commercially available, the court concluded that petitioners should have foreseen that a diameter

range of "5.00 mm or more, but less than 19.00 mm" would not capture all sizes of wire rod. *See

id.*; *Order*, 67 Fed. Reg. at 65,946. Yet petitioners, well-versed in the antidumping duty

investigation process, crafted their proposed scope language in a way that made diameter a

central feature and that clearly and unambiguously restricted subject merchandise by diameter.

*Deacero I*, 37 CIT at __, 942 F. Supp. 2d at 1330. Importantly, this court never made

independent factual findings regarding commercial availability or petitioners' actual knowledge

of 4.75 mm wire rod's existence during the investigation.[3]

In light of the foregoing, the court rejected Commerce's conclusion that 4.75 mm wire

rod was "'so insignificantly changed'" from subject wire rod that it should come within the Wire

Rod Order. *Id.* (quoting *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir.

1998)). Because a minor or insignificant change connotes something unimportant, the plain

meaning of those words and the record did not appear to support Commerce's original

---

[3] Defendant-Intervenors and the Government incorrectly attribute a variety of findings to the court. In addition to those noted above, the Government claims in its brief that "[t]he Court . . . determined . . . that Commerce . . . could not have initiated a later-developed product inquiry . . . ." Gov't Cmts. 5 n.2. It is unclear where the Government finds support for that proposition in *Deacero I*, as no one challenged Commerce's decision to forego a later-developed product inquiry and the court never addressed Commerce's analysis in that regard.

determination.  *See id.* at 1330–31.  In the court's assessment, this case did not involve the type

of change that Congress contemplated when enacting the minor alterations provision—i.e., a

small, unforeseen manipulation of subject merchandise like adding a memory feature to a

typewriter that was otherwise covered by an order.  *See* S. Rep. No. 100-71, at 101 (1987).

Rather, this case involved a distinct product that Commerce found was commercially available

during the investigation and that was clearly excluded from the scope description.

Commerce changed course on remand and reversed its affirmative circumvention

determination under protest.  *Remand Results* 6.  Commerce noted that its determination was

"based on the Court's discussion that petitioners intentionally set the parameters of the scope of

the *Order* to expressly exclude wire rod whose actual diameters were less than 5.00 mm and

more than 19.00 mm as evidenced by the fact that 4.75 mm wire rod was commercially available

and petitioners did not include it in the scope."  *Id.*

## SUBJECT MATTER JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court must sustain

Commerce's remand redetermination if it is supported by substantial record evidence, is

otherwise in accordance with law, and is consistent with the court's remand order.  *See* 19 U.S.C.

§ 1516a(b)(1)(B)(i); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 38 CIT __, __, 992 F.

Supp. 2d 1285, 1290 (2014).

## DISCUSSION

Defendant-Intervenors essentially argue that the court in *Deacero I* made factual findings

reserved for Commerce, and those findings were unsupported and based on a misunderstanding

of the law governing circumvention inquiries.  In particular, Defendant-Intervenors claim that the

court (1) rendered minor alteration inquiries superfluous by effectively converting them into

later-developed product inquiries; (2) made factual findings by concluding that the Wire Rod

Order specifically excluded 4.75 mm wire rod and that diameter was the fundamental focus of

the Wire Rod Order; (3) conflated scope and circumvention inquiries; (4) created a conflict with

Federal Circuit precedent; and (5) impermissibly prevented Defendant-Intervenors and

Commerce from revisiting Commerce's commercial availability finding.  Because Commerce

adopted the court's logic under protest, Defendant-Intervenors aver that Commerce abandoned

its administrative role and, similar to the court, made findings that were unsupported by

substantial evidence and not in accordance with law.  As set forth below, the court largely rejects

Defendant-Intervenors' arguments but will give Commerce an opportunity to explain whether it

wishes to revisit its commercial availability finding.

I.      **By following the court's reasoning under protest, Commerce did not nullify
        other parts of the circumvention statute, abdicate its fact-finding role, or
        conflate circumvention inquiries with scope inquiries**

Many of Defendant-Intervenors' arguments are premised on a misunderstanding of the

court's decision in *Deacero I*.  For instance, the Domestic Industry argues that the minor

alterations provision and the later-developed product provision are near equivalents, except that

the later-developed product provision contemplates a temporal analysis into when the product

became commercially available.  Domestic Indus. Cmts. 11.  By determining that temporal

considerations may also be relevant to a minor alteration analysis, the Domestic Industry asserts

that the court rendered the minor alteration provision superfluous.  *Id.*  But that argument is

unpersuasive because the court held only that commercial availability was relevant in this

particular case, not that commercial availability was dispositive for all cases.  *See Deacero I*, 37

CIT at __, 942 F. Supp. 2d at 1328–29.[4]  Indeed, the court's holding was consistent with

---

[4] In any event, the court does not agree that the minor alterations provision would be superfluous even if

(footnote continued)

Commerce's acknowledged practice in other minor alteration inquiries.  *See Initiation Mem.* 14

("[A]lthough not specified in the Act, the Department has also included additional factors in its

analysis, such as commercial availability of the product at issue prior to the issuance of the

order.").  Thus, when Commerce incorporated commercial availability into its analysis on

remand, it merely aligned its determination with its prior practice.

The Domestic Industry claims that the natural effect of the court's holding was to impose

a "*de facto*" commercial availability bar in every minor alteration inquiry.  Domestic Indus.

Cmts. 13.  However, contrary to the Domestic Industry's assertions, the court did not "implicitly

assum[e] that any pre-existing product that was not specifically included in the scope must have

been specifically and knowingly excluded from the scope."  *Id.* at 11.  There may well be

circumstances where pre-existing, or even commercially available, non-subject merchandise

could reasonably come within an order's scope as a circumventing minor alteration of subject

merchandise.  The court never suggested that petitioners must foresee every possible

hypertechnical modification of subject merchandise and account for that possibility when

crafting proposed scope language.  The very purpose of the minor alterations provision is to

remedy these hypertechnical changes, and it is plausible that pre-existing products may be used

in an unforeseen way to circumvent an order.

Nevertheless, the minor alterations provision is not a vehicle for companies to expand an

order in a way that petitioners avoided at the outset.  *See Wheatland*, 161 F.3d at 1371 (noting

that § 1677j(c) "does not . . . abrogate the cases prohibiting changing or interpreting orders

contrary to their terms"); *Wheatland Tube Co. v. United States*, 21 CIT 808, 826 & n.9, 973 F.

---

commercial availability were also a limiting element under the minor alteration provision.  The minor alteration provision is the only circumvention inquiry that does not require consultation with the International Trade Commission.  *See* 19 U.S.C. § 1677j(e).  Thus, the two provisions would not be equivalent even if both barred the inclusion of commercially available products because only one would permit Commerce to skip a procedural step.

Supp. 149, 163 & n.9 (1997).  That is precisely what Commerce did in its original *Final Determination* and what it has since corrected in its *Remand Results*.

　　　Defendant-Intervenors have never alleged that petitioners could not have foreseen the commercial production of small-diameter wire rod.  Indeed, wire rod was already manufactured in varying sizes during the investigation, and logic suggests that it might also be manufactured in sizes outside of the specified range.  Undisputed record evidence demonstrates that small diameter wire rod existed domestically at some point in proximity to the investigation, and Commerce concluded that such wire rod was indeed commercially available prior to the Wire Rod Order's issuance.  *See Initiation Mem.* 14; Deacero Case Br. at Ex. 2, PD II 27 (Jan. 13, 2012), ECF No. 43 (Dec. 19, 2012); Deacero Submission at Ex. 9, PD I 10 (Mar. 15, 2011), ECF No. 43 (Dec. 19, 2012) ("*Deacero March 2011 Submission*").  Furthermore, petitioners themselves noted in their petition that 5.5 mm wire rod was the "'smallest cross-sectional diameter that is hot-rolled in *significant* commercial quantities,'" suggesting that smaller sizes may have been manufactured in limited commercial quantities at the time of the investigation. *See Initiation Mem.* 4 (emphasis added) (quoting *Deacero March 2011 Submission* at Ex. 2 at 9). Petitioners were sophisticated companies that could have proposed to define the Wire Rod Order in broader terms or without reference to diameter.  But instead petitioners selected diameter as a central physical characteristic[5] and risked the clearly foreseeable possibility that small diameter wire rod either was or might soon be in commercial production.

---

[5] The Domestic Industry argues that the court engaged in factfinding when it declared diameter an essential and fundamental characteristic under the Wire Rod Order.  Domestic Indus. Cmts. at 24–36.  But the court did not intend to suggest that diameter is more important than every other physical descriptor in the Wire Rod Order. Instead, the court's discussion was meant to reiterate that petitioners chose to elevate certain characteristics— including diameter—above other characteristics when proposing the scope of the Wire Rod Order.  Petitioners (and Commerce, by accepting petitioners' scope language) thus deemed those characteristics fundamental and essential, and Commerce could not reasonably dismiss the very same characteristics as meaningless.  *Cf. Carbon and Certain*

(footnote continued)

It was *in this context* that the court concluded Commerce's scope language "could not be anything less than the specific exclusion of 4.75 mm wire rod." *Deacero I*, 37 CIT at __, 942 F. Supp. 2d at 1331. Thus, the court never found, as the Domestic Industry suggests, that all merchandise outside of an order's scope is specifically excluded. *See* Domestic Indus. Cmts. 19. Such a holding would have indeed nullified the minor alteration provision, which necessarily reaches merchandise outside an order's literal scope. *See Deacero I*, 37 CIT at __, 942 F. Supp. 2d at 1326. Rather, the court limited the reach of the minor alteration provision to avoid a result not contemplated by the statute and precluded by case law. Though circumvention inquiries are an important tool for Commerce, those inquiries cannot change orders to cover distinct products that petitioners could have proposed to include but did not. *Wheatland*, 161 F.3d at 1371.[6]

As the court noted in *Deacero I*, any other conclusion would risk "'frustrat[ing] the purpose of the antidumping laws' by 'allow[ing] Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation.'" 37 CIT at __, 942 F. Supp.

---

*Alloy Steel Wire Rod from Mexico*, 76 Fed. Reg. 78,882, 78,884 (Dep't Commerce Dec. 20, 2011) (affirm. prelim. determination) (finding "wire rod with an actual diameter between 4.75 mm and 5.0 mm and subject wire rod are indistinguishable in any meaningful sense in terms of overall physical characteristics").

Although the Domestic Industry faults the court for displacing the results of the five-factor analysis that Commerce performed to reach an affirmative circumvention determination, the court disagrees that the result of that analysis controls the outcome here. *See* Domestic Indus. Cmts. 35–36. An example illustrates this point. Assume, for instance, that domestic producers of blue shirts petitioned for the imposition of an antidumping duty order on "blue shirts from Mexico." Petitioners crafted their proposed scope language knowing that red shirts were commercially available but failed to *specifically* exclude red shirts. Commerce could later initiate a minor alteration inquiry and, applying its five-factor analysis, determine that the two products are virtually identical except with regard to color. Yet this analysis would ignore that color is the very same characteristic that petitioners intentionally selected to distinguish subject merchandise from non-subject merchandise.

[6] The Domestic Industry cites a series of cases and administrative proceedings in support of the argument that the diameter restriction at issue here was not a specific exclusion from the Wire Rod Order. Domestic Indus. Cmts. 20–24. But as in *Deacero I*, the court continues to conclude that the cited cases are distinguishable. *See* 37 CIT at__, 942 F. Supp. 2d at 1331 n.5. The court also disagrees that Commerce's prior administrative proceedings compel a different result. One of the cited proceedings was a scope ruling, not a circumvention inquiry, and involved scope language with greater flexibility—namely, pasta "'sold . . . in packages *typically* of five pounds or less.'" *See* Domestic Indus. Cmts. 21 (emphasis added) (quoting scope language). Lastly, the Domestic Industry cites a minor alteration inquiry where Commerce found that 17-inch diameter electrodes were circumventing an order on small diameter graphite electrodes of 16 inches or less in diameter. *See id.* The court is not familiar with the circumstances of that proceeding and declines to speculate on the reasonableness of Commerce's analysis there.

2d at 1332 n.6 (quoting *Wheatland* 161 F.3d at 1371).  A contrary holding would also encourage

gamesmanship from petitioners, who might narrowly frame proposed scope language to assure

an affirmative injury determination and later use circumvention inquiries to cover non-subject

merchandise that might have originally prompted a negative injury determination.  *See id.*

   In sum, the minor alterations provision must be applied carefully to reach only truly

insignificant changes to subject merchandise.  The court concluded that Commerce's *Final*

*Determination* interpreted the Wire Rod Order contrary to its carefully-crafted terms and was

neither supported by substantial evidence nor in accordance with law.  *Id.* at 1332.  Commerce

has since corrected that erroneous determination under protest, and, except as noted below, the

*Remand Results* are adequately supported.

## II.    Commerce's *Remand Results* did not conflict with the Federal Circuit's decision in *Nippon Steel Corporation v. United States*

   Nucor additionally argues that Commerce's *Remand Results* conflict with the Federal

Circuit's opinion in *Nippon Steel Corp. v. United States*, 219 F.3d 1348 (Fed. Cir. 2000), but

Nucor's argument is premised on an overbroad interpretation of that case.  *See* Nucor Cmts. 11–

12; Nucor Draft Cmts. 12–13, PRD 4 (Dec. 16, 2013), ECF No. 89 (Feb. 21, 2014).  In *Nippon*,

the order at issue covered certain carbon steel products, which the petition in turn defined to

exclude "other alloy steel."  219 F.3d at 1350.  Petitioners defined "other alloy steel" by

reference to fifteen elements combined with specified percentages.  *Id.*  One of the fifteen

elements was boron, and a product was considered "other alloy steel" if it contained 0.0008% or

more of boron.  *Id.*  Certain Japanese manufacturers subsequently began exporting what would

have otherwise been subject merchandise with small amounts of boron added above 0.0008%.

*Id.*  The addition of this element transformed the Japanese merchandise into "other alloy steel"

that fell outside the order's scope.  *See id.*

When Commerce initiated a minor alteration inquiry at the petitioners' request, a judge

on this Court preliminarily enjoined Commerce's inquiry.  Citing the Federal Circuit's opinion in

*Wheatland*, the court concluded that the boron-altered steel products were unambiguously

excluded from the order and that Commerce's inquiry was thus "'ultra vires.'"  *See id.* at 1355

(quoting lower court decision).  The Federal Circuit reversed the grant of injunctive relief on the

basis that it was "most inappropriate for a court to 'interfere with' the ongoing administrative

proceedings until Commerce 'has completed its action.'"  *Id.* (quoting *McKart v. United States*,

395 U.S. 185, 194 (1969)).  The Federal Circuit then distinguished *Wheatland* on procedural and

substantive grounds.  *Id.* at 1356.  Specifically, the court noted that unlike *Nippon*, *Wheatland*

involved review of final agency action and a decision *not* to initiate a minor alteration inquiry.

*Id.*  The court also noted that *Wheatland* involved a distinct product that was "unequivocally

excluded from the order" and that was "well known when the order was issued."  *Id.*

At no point in *Nippon* did the Federal Circuit state that it would have sustained an

affirmative circumvention determination; the court held only that Commerce should have an

opportunity to reach that determination in the first instance.  *See id.*  Nor did the Federal Circuit

hold that all products that are not demonstrably well known to the parties during the

investigation may later come within an order as a minor alteration of subject merchandise.  The

court thus rejects Nucor's effort to draw broader principles from *Nippon* where none exist,

especially in this factually distinct case.

### III.    Commerce's *Remand Results* cannot be sustained on the basis provided because they are premised on the incorrect conclusion that Commerce was bound by its prior commercial availability finding

Although Commerce ultimately reached a supportable result in its *Remand Results*,

remand is nonetheless necessary because Commerce arrived at that result by misinterpreting

*Deacero I*.  Specifically, Commerce incorrectly found that it was precluded from reconsidering

its commercial availability finding on remand.  *See Remand Results* 19 (recasting commercial

availability as a factual finding by the court binding on Commerce); Gov't Cmts. 14 (arguing

that the court "held that Commerce was bound as a matter of law by its previous commercial

availability finding").  The court determined only that Defendant-Intervenors could not contest

the validity of a finding when they had not satisfied the jurisdictional prerequisites for judicial

review and their purpose in the litigation was to support Commerce's determination.  *See*

*Deacero I*, 37 CIT at __, 942 F. Supp. 2d at 1330 & n.3.  In other words, the court concluded that

it could not order Commerce to reconsider its commercial availability finding when Deacero did

not contest that finding.  The court never held that Commerce was bound by its prior finding.

Commerce's *Remand Results* are premised on a mistaken interpretation of *Deacero I*, and

the court cannot sustain on the basis that Commerce has provided.  Nonetheless, the court

declines to order a full remand without knowing whether Commerce would have reconsidered its

commercial availability finding but for its incorrect reading of *Deacero I*.  Instead, the court has

decided to elicit an explanation from Commerce regarding whether it seeks the court's leave to

revisit the issue of commercial availability.  If Commerce answers that question affirmatively,

Commerce must inform the court how long it requests to conduct its inquiry and whether it plans

to reopen the record.  The court will then take the issue under advisement and consider whether

to remand for additional proceedings.

Though the court wants to ensure that the parties are heard on the issue of commercial

availability, undisputed record evidence suggests that small diameter wire rod existed in the

United States and Japan at some point relatively near to the Wire Rod Order's issuance.

Moreover, as discussed above, the current record does not appear to support a conclusion that the

commercial production of wire rod outside of the scope boundaries was unforeseeable.  Thus,

even if Commerce were to reconsider and ultimately reverse its commercial availability finding,

the court would likely still have concerns about the reasonableness of an affirmative

circumvention determination in this case.  But again, the purpose of this limited remand is solely

to seek clarification from Commerce regarding its desire to reconsider its prior finding.

## <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, this matter is remanded so Commerce may consider whether it

wishes to revisit or elaborate on its finding that small diameter wire rod was commercially

available prior to issuance of the Wire Rod Order.  Accordingly, upon consideration of all papers

and proceedings in this case and upon due deliberation, it is hereby

**ORDERED** that the *Remand Results* are remanded to Commerce for reconsideration and
redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall file its response to this Opinion and Order within thirty
(30) days of the date of this Opinion and Order; it is further

**ORDERED** that Commerce's response must articulate whether Commerce wishes to
reconsider its commercial availability finding; and it is further

**ORDERED** that if Commerce wishes to reconsider its commercial availability finding,
Commerce's response must also specify the amount of time requested to complete that inquiry
and whether Commerce intends to reopen the record.

<u>/s/ Richard W. Goldberg</u>
 Richard W. Goldberg
Senior Judge

Dated:   August 28, 2014
              New York, New York