Slip Op. 14-151

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DEACERO S.A.P.I. DE C.V. and DEACERO USA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> ARCELORMITTAL USA LLC, GERDAU AMERISTEEL U.S. INC., EVRAZ ROCKY MOUNTAIN STEEL, and NUCOR CORPORATION, <br><br> Defendant-Intervenors. | Before: Richard W. Goldberg, Senior Judge <br> Court No. 12-00345 |

**OPINION**

[Sustaining the Department of Commerce's negative circumvention determination on remand.]

Dated: December 22, 2014

 *David E. Bond* and *Jay C. Campbell*, White & Case LLP, of Washington, DC, for plaintiffs.

 *Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With her on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *David Richardson*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

 *Paul C. Rosenthal, Kathleen W. Cannon, R. Alan Luberda*, and *David C. Smith*, Kelley Drye & Warren LLP, of Washington, DC, for defendant-intervenors ArcelorMittal USA LLC, Gerdau Ameristeel U.S. Inc., and Evraz Rocky Mountain Steel.

 *Alan H. Price, Daniel B. Pickard*, and *Maureen E. Thorson*, Wiley Rein LLP, of Washington, DC, for defendant-intervenor Nucor Corporation.

Goldberg, Senior Judge: This case has ricocheted between the court and the Department of Commerce ("Commerce" or "the Department") since 2012. The matter now returns here following a second remand, which asked Commerce whether it would reconsider a finding supporting its negative circumvention decision from the first remand. In the end, the Department chose not to revisit the finding in question. Thus substantial evidence remains on the record to buttress Commerce's decision not to subject plaintiffs' 4.75 millimeter ("mm") wire rod to antidumping duties. The court sustains the negative circumvention determination from the first remand proceeding.

## **BACKGROUND**

The court sketched the background of this case already in its previous opinions. *See Deacero S.A. de C.V. v. United States*, 37 CIT __, __, 942 F. Supp. 2d 1321, 1324−25 (2013) ("*Deacero I*"); *Deacero S.A.P.I. de C.V. v. United States*, Slip Op. 14-99, 2014 WL 4244349, *1−3 (CIT Aug. 28, 2014) ("*Deacero II*"). Nevertheless, to ensure its holding is not misunderstood, the court repeats some of the history that it outlined before.

In October 2002, the Department issued an antidumping duty order on carbon and alloy steel wire rod from countries including Mexico. *Carbon and Certain Alloy Steel Wire Rod from Brazil, Indonesia, Mexico, Moldova, Trinidad and Tobago, and Ukraine*, 67 Fed. Reg. 65,945 (Dep't Commerce Oct. 29, 2002) (notice of antidumping duty orders) (the "Order"). The Order defined the subject merchandise as follows:

> The merchandise subject to these orders is certain hot-rolled products of carbon steel and alloy steel, in coils, of approximately round cross section, 5.00 mm or more, but less than 19.00 mm, in solid cross-sectional diameter.

*Id.* at 65,946. The Order also excluded a few types of rod from antidumping duties, including rod made of certain types of steel, and rod containing chemical elements in set quantities. *Id.*

After Commerce issued the Order, plaintiffs Deacero S.A. de C.V. and Deacero USA, Inc. (collectively "Deacero") began selling 4.75 mm wire rod in the United States. In response, domestic producers asked Commerce to decide whether Deacero's rod was subject to the Order. Req. for Scope/Circumvention Ruling 1−2, PD I 1 (Feb. 11, 2011). Commerce said it would not conduct a scope inquiry, however, because rod with an actual diameter of 4.75 mm fell outside the Order's terms. Initiation Mem. 2, 12−13, PD I 24 (May 31, 2011).

But Commerce's work did not end there. After refusing to conduct a scope inquiry, the Department considered whether the rod was "circumventing" the Order under 19 U.S.C. § 1677j (2012). Commerce first explored whether the rod was "later-developed merchandise" similar to the subject goods under § 1677j(d). The Department held it was not, finding that 4.75 mm rod was "commercially available" in Japan before the Order was written. *See* Initiation Mem. 13−14; *see also* 19 C.F.R. § 351.225(j) (2014). Commerce next examined whether the rod represented a "minor alteration" to the subject goods under § 1677j(c). Initiation Mem. at 14−15; *see also* 19 C.F.R. § 351.225(i). This time, Commerce found that the rod was circumventing. Because "wire rod with an actual diameter of 4.75 mm to 5.00 mm" differed from subject merchandise just slightly in "form or appearance," the Department included Deacero's rod "within the scope of the [O]rder." *Carbon and Certain Alloy Steel Wire Rod from Mexico*, 77 Fed. Reg. 59,892, 59,893 (Dep't Commerce Oct. 1, 2012) (final affirm. circumvention determination) ("*Final Determination*"); *see also* Issues & Decision Mem. at 18, PD II 47 (Sept. 24, 2012).

On appeal, the court invalidated Commerce's minor alterations decision as unfounded in substantial evidence. Citing *Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998), the court held that products which Commerce intentionally excluded from an order cannot

circumvent that order. *See Deacero I*, 37 CIT at __, 942 F. Supp. 2d at 1330−32. Yet here, the record showed, and Commerce found, that 4.75 mm rod was commercially available before the Order was drafted. The Order also omitted 4.75 mm rod from its scope. *Id.* Together, this evidence suggested that Commerce had exempted 4.75 mm rod from antidumping liability with intent. The court remanded so Commerce could revisit its decision in light of these data.

On remand, the Department reversed course and exempted Deacero's rod from the Order. Final Results of Redetermination Pursuant to Ct. Remand, ECF No. 87 ("First Remand Results"). It did so under protest. *See id.* at 1−2. As Commerce understood *Deacero I*, the court had decided on its own that "4.75 mm wire rod . . . existed in Japan at the time the petition was filed." *Id.* at 19. Commerce also lamented a second fact that the court supposedly found, namely, that "Petitioners intentionally sought to exclude 4.75 mm wire rod from the scope of the Order." *Id.* In the Commerce's view, these alleged findings forced the conclusion that 4.75 mm rod was not a minor alteration. The Department also suggested, in so many words, that the court had overstepped its authority by making factual judgments reserved for the agency. *Id.* at 12−13, 19 (agreeing with petitioners, who said court "improperly engaged in fact finding").

Yet Commerce's depiction of *Deacero I* missed the mark. In *Deacero II*, the court explained that Commerce "reached a supportable result" on remand by deeming 4.75 mm rod noncircumventing merchandise. *Deacero II*, 2014 WL 4244349, at *6. But the court faulted the logic underpinning the Department's conclusion. Although Commerce hinted during the first remand that the court made *its own* finding respecting commercial availability in *Deacero I*, the court had done nothing of the sort. Instead, following its proper standard of review, the court had held that record evidence regarding commercial availability undermined *Commerce's* finding that Deacero's rod was a minor alteration. *See Deacero I*, 37 CIT at __, 942 F. Supp. 2d

at 1331−32. So, contrary to its claims, the Department was not bound by *Deacero I* to any particular findings of fact. *See Deacero II*, 2014 WL 4244349, at *6 ("The court never held that Commerce was bound by its prior [commercial availability] finding."). Because Commerce inadequately reasoned its first remand decision, *Deacero II* ordered another remand, this time to ask Commerce whether it wished to revisit the commercial availability issue or reopen the record in further proceedings. *Id.* at *7.

The court now has the Department's answer. *See* Final Results of Redetermination Pursuant to Ct. Remand 16, ECF No. 113 ("Second Remand Results"). In the Second Remand Results, Commerce declined to reconsider its commercial availability finding, because in Commerce's view, commercial availability is irrelevant to deciding whether minor aspects of a product were changed to fall outside an order's scope. *Id.* at 16−17. The Department explained that it examines commercial availability only when choosing between the later-developed product and minor alterations inquiries. *Id.* Commerce nevertheless maintained, under protest, that 4.75 mm rod did not circumvent the Order. *See id.* at 1 (restating result of first remand).

## DISCUSSION

The court now sustains Commerce's revised decision.[1] In the Second Remand Results, the Department waived the chance to revisit its earlier commercial availability finding. *See id.* at 16. And because this finding remains undisturbed, the record still indicates that Commerce excluded 4.75 mm rod from the Order with intent. Accordingly, the Department's negative circumvention determination was based in substantial evidence and in accordance with law.

But before concluding, the court will clarify and distill its holdings in *Deacero I* and *Deacero II*. In the Second Remand Results, Commerce alleged that the court had modified the

---

[1] The court has jurisdiction under 28 U.S.C. § 1581(c) and reviews Commerce's conclusions using the standards of review in 19 U.S.C. § 1516a(b)(1)(B)(i).

minor alterations analysis, *see id.* at 20–22, and barred affirmative circumvention determinations for products that were commercially available before an order issued, *see id.* at 16−17. These arguments betray a deep misunderstanding of the court's opinions. Properly viewed, the court's holdings are narrow and do not blunt Commerce's power to identify circumventing goods under 19 U.S.C. § 1677j(c) and 19 C.F.R. § 351.225(i).

      To aid understanding, the court reconstructs its rationale from the ground up. The court begins, as always, with the statute. In 19 U.S.C. § 1673(1), Commerce receives the authority to decide whether certain "class[es] or kind[s] of foreign merchandise" were sold in the United States for less-than-fair value. This provision empowers Commerce, as a natural corollary, to define the goods covered by antidumping orders. *See Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1089 (Fed. Cir. 2002) (recognizing Commerce's "inherent power" to define parameters of an investigation); *Wheatland Tube Co. v. United States*, 21 CIT 808, 815, 973 F. Supp. 149, 155 (1997) (same). Moreover, once Commerce has written an order, it enjoys some latitude to interpret the order's application to imported goods. *See Ericsson GE Mobile Commc'ns, Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995). But the Department may not interpret an order "in a way contrary to its terms." *Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990). Commerce cannot constructively rewrite an order to cover items outside the order's literal scope.

      This general rule can yield unfair results, however. Because Commerce normally limits antidumping orders to their terms, exporters sometimes alter their goods to avoid duties. For example, in response to an order on manual typewriters, an exporter of typewriters might add a memory function to the product to remove it from the order's scope. *See* S. Rep. No. 100-71, at 101 (1987). To prevent situations like this, Congress enacted the circumvention provisions in 19

U.S.C. § 1677j. *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 101-41, § 1321, 102 Stat. 1107, 1192 (1988) (codified as amended at 19 U.S.C. § 1677j (2012)). The subsection at issue in this case, 19 U.S.C. § 1677j(c), requires Commerce to include among subject merchandise any "articles altered in form or appearance in minor respects . . . , whether or not included in the same tariff classification [as goods described in the order]." In other words, if a product differs from subject goods in an insignificant way, that product may face antidumping duties even though it lies outside the order's literal bounds.

But this exception has limits. While § 1677j(c) lets Commerce reach items outside an order's plain terms, the exception does not touch products that were placed beyond an order's scope by design. As the Federal Circuit declared in *Wheatland*, "[s]ection 1677j(c) does not [] apply to products unequivocally excluded from the order in the first place." 161 F.3d at 1371.

At first blush, this rule from *Wheatland* seems poised to swallow the minor alterations provision altogether. On one hand, Congress enacted § 1677j(c) to reach goods falling outside of an order's literal scope; on the other hand, *Wheatland* says § 1677j(c) cannot cover items that were unequivocally excluded from an order. So how can one read these rules in concert? If one assumes that any item falling outside of an order's literal scope was unequivocally excluded, then the rules clearly conflict. Although § 1677j(c) empowers Commerce to extend orders beyond their terms to prevent circumvention, the declaration in *Wheatland* would revoke that power by restricting duties to items within an order's four corners. Nevertheless, if one posits that not all items outside an order's scope were unequivocally excluded, then the rules dovetail. A context-sensitive survey of *Wheatland* and other Federal Circuit precedent supports the latter view. *Armour & Co. v. Wantock*, 323 U.S. 126, 132−33 (1944) (urging counsel to interpret

language of opinion in light of its facts); *Can. Imperial Bank of Commerce v. Wells Fargo Bank*, 811 F.2d 1490, 1494 (Fed. Cir. 1987).

In *Wheatland*, the Federal Circuit considered whether to grant Commerce a remand to decide if line and dual-certified pipe circumvented an order on standard pipe. 161 F.3d at 1366−69. The court said remand would be inappropriate for two reasons. First, it found that the order excluded line and dual-certified pipe in absolute terms. *Id.* at 1371. In a freestanding sentence at the end of the order, Commerce wrote, "Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe . . . is . . . not included in this investigation." *Id.* at 1367 (emphasis omitted). Second, the Federal Circuit noted that petitioner had argued to exclude line and dual-certified pipe from the order, even though it knew the pipe was "capable of standard applications." *Id.* at 1371. From this evidence, the court inferred that Commerce intentionally excluded line and dual-certified pipe from the order. And because the Department intentionally excluded that pipe from the order, *Wheatland* denied Commerce's request for remand to conduct a minor alterations inquiry. *Id.*

In sum, despite its broad language about items "unequivocally excluded" from antidumping orders, *Wheatland* stands for this narrow proposition: The minor alterations provision does not apply to goods that Commerce knew existed commercially when writing an order, yet excluded from the order anyway.

By contrast, the provision can cover items that were excluded from an antidumping order without intent—and this remains so even if the items fall outside the order's plain terms. *Nippon Steel Corp. v. United States*, 219 F.3d 1348 (Fed. Cir. 2000), illustrates the principle. There, Commerce imposed duties on certain carbon steel products from Japan. After the order issued, Japanese producers added small amounts of boron to their goods so they would no longer be

"carbon steel," as defined in the U.S. Harmonized Tariff Schedule. *Id.* at 1350. Commerce launched a minor alterations inquiry to decide whether steel products with trace amounts of boron circumvented the order. *Id.* At first, the Court of International Trade enjoined the inquiry. The court held that Commerce could not apply the minor alterations provision to products outside the order's literal scope. *Id.* at 1351. But the Federal Circuit reversed and let the inquiry continue. In doing so, *Nippon* distinguished *Wheatland* on procedural grounds, and noted that *Wheatland* "involved two different products, both of which were well known when the order was issued." *Nippon*, by contrast, involved "a product produced by making allegedly insignificant alterations to an existing product." *Id.* at 1356. It seems, then, that *Nippon* allowed the inquiry to proceed because there was no clear evidence that Commerce willfully excluded the boron-laced product from the order.

The court's decisions in *Deacero I* and *II* build upon these precedents. As in *Wheatland*, record evidence in this case suggests that Commerce intentionally exempted 4.75 mm wire rod from the Order. First, as explained in *Deacero I*, the Order plainly excludes from its scope rod under 5.00 mm in diameter. 37 CIT at __, 942 F. Supp. 2d at 1330−31. Of course, the Order does not set the exclusion apart in a separate clause, like in *Wheatland*. *See* 161 F.3d at 1367. But where Commerce placed the exclusion is of little moment. By defining subject rod between 5.00 and 19.00 mm in diameter, Commerce unambiguously omitted rod of lesser width from the Order. And although the exclusion might have been clearer had Commerce set it in a separate clause at the end of the Order, to do so would have been redundant. An order covering rod between 5.00 and 19.00 mm inherently excludes products of any other diameter, including 4.75 mm rod.

Second, the finding that 4.75 mm rod was "commercially available" before the Order was drafted implies that Commerce excluded the rod on purpose. As recounted in *Deacero II*, "[u]ndisputed record evidence demonstrates that small diameter wire rod existed domestically at some point in proximity to the investigation, and Commerce concluded that such wire rod was indeed commercially available prior to the Wire Rod Order's issuance." 2014 WL 4244349, at *4. "Furthermore, [the] petitioners themselves noted in their petition that 5.5 mm wire rod was the 'smallest cross-sectional diameter that is hot-rolled in *significant* commercial quantities,' suggesting that smaller sizes may have been manufactured in limited commercial quantities at the time of the investigation." *Id.* (quoting Initiation Mem. at 4). This evidence signals that Commerce excluded 4.75 mm rod from the Order not by lack of foresight, but with full knowledge of the product's existence. Moreover, though Commerce could have reopened the record and reached a different conclusion regarding commercial availability on a third remand, it declined the invitation to do so. *See* Second Remand Results at 16.

Together, the Order's language—and the undisturbed finding that 4.75 mm rod was commercially available before the Order issued—suggest Commerce intentionally excluded 4.75 mm rod from the Order. Thus, under *Wheatland*, the Department's negative circumvention determination on remand was supported by substantial evidence.

The Department and defendant-intervenors counter with many of the same arguments made in their original briefs and following the first remand. *See id.* at 9−22. The court addressed most of these arguments in *Deacero II* and need not discuss them again here. Even so, to ensure that its holdings are not misunderstood, the court sets a few matters straight.

To begin, Commerce argues that *Deacero I* announced a new test to decide whether an alteration is minor under the statute. The Department calls the alleged test the "fundamental

focus" analysis. *See id.* at 20−21. Under the test, a change to subject merchandise would be deemed "minor" only if it affects an insignificant or nonfundamental physical aspect of the good. Conversely, a change would qualify as more than minor if it affected one of the good's central physical attributes. *Id.* Commerce complains that this test lacks a basis in precedent, *id.* (explaining *Wheatland* does not mention fundamental focus test), and implies that the test unjustly supplanted the five-factor inquiry generally used to identify minor alterations, *see id.* at 17−18 (explaining application of five-factor test to Deacero's rod); S. Rep. No. 100-71, at 100 (outlining five factors to consider in minor alterations analysis). Commerce also alleges that the court infringed its fact-finding authority by deeming diameter a "fundamental" characteristic of wire rod. *See* Second Remand Results at 20−22.

These arguments twist the court's holding almost beyond recognition. Although *Deacero I* called diameter "the fundamental focus of the Order," it did not mint a new fundamental focus test to replace Commerce's usual minor alterations analysis. *See* 37 CIT at __, 942 F. Supp. 2d at 1330. Nor did the court find that diameter is more important to wire rod's usefulness than other traits, like grade or carbon content. *See id.*; *see also Deacero II*, 2014 WL 4244349, at *4 n.5 ("[T]he court did not intend to suggest [in *Deacero I*] that diameter is more important than every other physical descriptor in the Wire Rod Order."). Commerce can decide for itself whether consumers buy wire rod for its diameter or other qualities.

Yet diameter was "fundamental" to the minor alterations analysis in another way. When Commerce defined the subject goods, it chose diameter to distinguish subject rod from nonsubject rod. The Order's plain language covered wire rod between 5.00 and 19.00 mm in width, and omitted rod of any other diameter. *See* Order at 65,946. This omission—together with the finding that 4.75 mm rod was commercially available before the Order issued—implied

that Commerce willfully excluded 4.75 mm rod from the Order. So when the court called diameter "fundamental," it meant that the Order's focus on diameter revealed an intent to exempt some rod from duties. The court never said that diameter was the rod's most important physical or commercial attribute.

Furthermore, the court never held that products found to be commercially available when an order was drafted cannot also circumvent that order under § 1677j(c). *See* Second Remand Results at 16−18 (arguing commercial availability does not bar minor alteration finding). In *Deacero I*, the court conducted a *Chevron* analysis and held that the minor alterations provision may reach products that preexisted an order. 37 CIT at __, 942 F. Supp. 2d at 1327−29. The provision might apply, for example, if Commerce found that a product was commercially available, but did not unambiguously exclude that product from an order. *Cf. Target Corp. v. United States*, 609 F.3d 1352, 1362−63 (Fed. Cir. 2010) (holding order on petroleum wax candles could cover mixed-wax candles under later-developed product provision). But here, Commerce clearly omitted 4.75 mm rod and found that the product was available commercially before the Order was written. This evidence indicates that Commerce intended to exempt 4.75 mm rod from antidumping duties.

Finally, the Department argues that commercial availability is irrelevant to the minor alterations analysis. It notes that Commerce examined commercial availability below only to inform its choice between the minor alterations and later-developed product inquiries. *See* Second Remand Results at 16−17. But past agency practice belies the Department's stance. In 1991, Commerce determined that certain manganese brass had not circumvented an order on brass strip from Germany. It based its decision, in part, on the fact that the manganese "brass existed prior to, and at the time of, the original investigation." *Brass Sheet and Strip from*

*Germany*, 56 Fed. Reg. 65,884, 65,886 (Dep't Commerce Dec. 19, 1991) (negative final circumvention determination).  Furthermore, as recently as 2009, Commerce held that certain folding tables could not have been excluded from an order because the tables did not exist during the investigation.  *Folding Metal Tables and Chairs from the People's Republic of China*, 74 Fed. Reg. 21,332 (Dep't Commerce May 7, 2009) (notice of extension of time), and accompanying Final Analysis Mem. at cmt. 2.  So even if Commerce usually ignores commercial availability in its minor alterations inquiry, that does not render the commercial availability finding immaterial here.  *See Ceramark Tech., Inc. v. United States*, 38 CIT __, __, 11 F. Supp. 3d 1317, 1324−25 (2014) (remanding minor alterations decision where order omitted electrodes of specific diameter and Commerce failed to consider commercial availability).  On the contrary, the finding bespeaks Commerce's intent to exclude 4.75 mm wire rod from the antidumping Order, as discussed above.

## CONCLUSION

Commerce's negative circumvention determination, as outlined in the First and Second Remand Results, is supported by substantial evidence and in accordance with law.  The court now sustains the determination, and judgment will enter accordingly.

/s/ Richard W. Goldberg
Richard W. Goldberg
Senior Judge

Dated:   December 22, 2014
          New York, New York